***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioners Gregory and Deluca and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Deluca with minor modifications.
 ***********
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The date of the alleged occupational disease or injury in this claim is May 22, 2003, although the evidence may show another date on which the plaintiff was both (1) disabled and (2) first diagnosed as having a work-related medical condition by his doctors.
2. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. An employer-employee relationship existed between the plaintiff and the defendant-employer.
4. The defendant-employer regularly employed three or more employees in the state of North Carolina.
5. The parties stipulated that the insurance carrier was Insurance Company of the State of Pennsylvania, however, the records of the Industrial Commission reflect and the employer agrees that the proper carrier is American Protective Insurance.
6. The plaintiff received unemployment compensation from the North Carolina Employment Security Commission in the following amounts and during the following periods: (a) July 6, 2003, through July 19, 2003, at the rate of $408.00 per week before taxes; and (b) November 23, 2003, through May 4, 2003 at the rate of $408.00 per week before taxes.
7. The plaintiff's average weekly wage is $936.88, resulting in a compensation rate of $624.59.
8. The plaintiff returned to work for the defendant-employer on May 4, 2004, in a job in the flight tower earning at least his pre-injury average weekly wages.
9. The issues at dispute in this hearing are: (1) whether the plaintiff has developed a compensable occupational disease or injury; (2) whether the defendants are liable for medical compensation related to this occupational disease or injury; (3) whether the plaintiff has been disabled; and (4) if so, what is the extent of disability.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff was 49 years old at the time of the hearing before the Deputy Commissioner, and began working for defendant-employer on June 10, 1981. For the five years prior to the hearing before the Deputy Commissioner, the plaintiff worked at defendant-employer's hub at the Charlotte Airport. The plaintiff spent the first six months of this period in defendant-employer's catering department, and spent the next three and one half years in the fleet service department. Plaintiff had also worked in the fleet service department at airports in different cities during his tenure with defendant-employer.
2. As of June 12, 2003, thirty-seven employees worked in the fleet service department for defendant-employer, including the plaintiff. They worked in teams of three to six people at a gate, and the team members rotated job duties as a counter, two "bin" people, and sometimes an assigned bag runner, depending on whether they were loading or unloading a plane.
3. All of these jobs involved repetitive lifting of bags and cargo onto planes. Since September 11, 2001, the volume of the plaintiff's work activities has decreased. Even so, the plaintiff has had to work at least five flights or "pushes" a day, in which his team unloaded planes that arrived, and then loaded them in preparation for takeoff. The loading team consisted of three to six people, while the unloading team only required a team of three people. Each "push" lasted 55 minutes, including 15 to 20 minutes of loading and 15 to 20 minutes of unloading, with a break of anywhere between 10 and 15 minutes in between.
4. When loading a plane during a "push," the plaintiff had to lift and move between 110 and 180 items of luggage and cargo on an average day, in addition to mail and freight that weighed between 1,000 and 1,500 pounds collectively.
5. When unloading a plane during a "push," the plaintiff had to lift and move between 70 and 110 items of luggage and cargo on an average day, also in addition to mail and freight that weighed between 1,000 and 1,500 pounds collectively.
6. Each item of luggage and cargo that the plaintiff had to lift while loading and unloading planes weighed between 20 and 100 pounds.
7. At times, the plaintiff's work volume increased. An example of this was when he had to work on weekends or on flights to particular destinations, such as resort destinations. The frequencies, numbers, and weights referenced in the previous paragraphs are based on activities that the plaintiff did in his fleet service job on an average day.
8. When loading and unloading luggage, cargo, mail, freight, and other items onto and off of planes, the plaintiff had to work in confined spaces. He used both arms to lift, throw, and move these items, and he frequently banged his arms against the insides of the luggage cabins of the plane and the fuselage when doing so.
9. The plaintiff's job in fleet service required him to lift and move more luggage, cargo, mail, freight, and similar items as compared to employees in any other department in defendant-employer's operations at the Charlotte Airport.
10. In January or February 2003, the plaintiff first started to notice atrophy in his left hand. This atrophy was not associated with any pain, and the plaintiff did not consult a doctor about it at that time. The plaintiff continued to work in defendant-employer's fleet service department.
11. On May 22, 2003, the plaintiff was working a flight to Pittsburgh for a professional sports team that had 190 bags to unload. The bags were heavy because of the sports equipment that was in them. When the plaintiff lifted one bag to throw it into the luggage cart, he hit his left arm and felt a burning pain down his arm, up through his neck, and down his back.
12. On May 22, 2003, the plaintiff went to the Emergency Room at Presbyterian Hospital in Charlotte, North Carolina. The emergency room record noted a "lifting" incident that had occurred just before the plaintiff had arrived that day, causing tingling, numbness, and a sharp burning pain in the plaintiff's left arm. The emergency room doctors diagnosed the plaintiff with a left shoulder strain and chronic muscle atrophy and advised him to follow up with an orthopedist or neurologist.
13. On May 23, 2003, the plaintiff went to Dr. Roger Hershline, who is the defendant-employer's company doctor. Dr. Hershline diagnosed the plaintiff with a left shoulder strain that was related to the incident on May 22, 2003, but also noted that the plaintiff had significant muscle atrophy in his left hand. Dr. Hershline did not treat the plaintiff for this atrophy and declined to give an opinion as to any relationship between the atrophy and the plaintiff's work activities in fleet service. However, Dr. Hershline did advise the plaintiff that he probably had carpal tunnel syndrome and recommended that the plaintiff see his primary care physician for a nerve conduction study with respect to the atrophy.
14. The diagnosis of left shoulder strain was caused by the plaintiff's lifting incident at work on May 22, 2003. With respect to this diagnosis, the plaintiff fully recovered and was released to return to work by Dr. Hershline on June 11, 2003. Dr. Hershline released the plaintiff to return to work based solely on the diagnosis of a left shoulder strain.
15. On May 23, 2003, the plaintiff went to his primary care physician, Dr. Jeffrey Nielsen, for a nerve conduction study based on Dr. Hershline's recommendation. Dr. Nielsen noted a four- to five-month history of atrophy developing in the plaintiff's left hand with associated numbness extending up through the shoulder. Dr. Nielsen suspected some type of nerve entrapment syndrome and referred the plaintiff to Dr. Chris Paramore, a neurosurgeon, in Mooresville, North Carolina.
16. On May 28, 2003, Dr. Paramore treated the plaintiff with the help of a nurse practitioner in Dr. Paramore's office. Dr. Paramore noted the plaintiff's work duties, and on physical examination found motor loss, loss of strength, sensory loss, atrophy, and limited range of motion. Dr. Paramore diagnosed the plaintiff with classic ulnar neuropathy and referred him to Dr. Andrew Braunstein, a neurologist in Mooresville, for diagnostic testing.
17. On May 30, 2003, the plaintiff saw Dr. Braunstein on the recommendation of both Dr. Paramore and the emergency room doctors at Presbyterian Hospital. After reviewing the results of EMG and nerve conduction studies and taking a history of the plaintiff's problems, Dr. Braunstein diagnosed the plaintiff with left ulnar neuropathy. After discussing the plaintiff's treatment with Dr. Braunstein, Dr. Paramore noted the plaintiff's work activities and found that it was reasonable to conclude that the plaintiff's left ulnar neuropathy represented a repetitive stress injury. Dr. Braunstein and Dr. Nielsen confirmed the probable relationship between the plaintiff's work and his development of left ulnar neuropathy. Dr. Paramore also scheduled a left ulnar reconstructive surgery for June 19, 2003.
18. According to Dr. Paramore and Dr. Braunstein, the plaintiff's work activities and employment placed him at an increased risk of developing ulnar neuropathy. Furthermore, plaintiff's work activities and employment significantly contributed to and caused the development of his left ulnar neuropathy.
19. Dr. Hershline never provided any medical treatment to the plaintiff for his left ulnar neuropathy, and only diagnosed Plaintiff with carpal tunnel syndrome. Dr. Hershline referred Plaintiff to his primary care physicians because his long-standing atrophy was not associated with the incident that had occurred on May 22, 2003.
20. According to Dr. Hershline, carpal tunnel syndrome is not the same condition as left ulnar neuropathy. Carpal tunnel syndrome usually affects the wrist, while ulnar neuropathy generally affects the elbow.
21. On June 19, 2003, Dr. Paramore performed a left ulnar release on the plaintiff's left elbow.
22. The plaintiff was out of work from June 12, 2003, through July 22, 2003, for medical reasons. However, he also received unemployment compensation at the rate of $408.00 per week from July 6, 2003, through July 19, 2003, for a total of $816.00.
23. The plaintiff returned to work with the defendant-employer on July 23, 2003, in a light-duty position doing mail and freight reports. This job was temporary and only lasted through August 10, 2003, when the defendant-employer took the plaintiff out of this job. The plaintiff was not allowed to work overtime while doing mail and freight reports, and he earned less than his pre-injury average weekly wages.
24. The plaintiff's job doing mail and freight reports between July 23, 2003, and August 10, 2003, involved special accommodations and did not reflect the plaintiff's capacity to earn wages in the competitive job market. The Full Commission finds that this job was not suitable employment.
25. The plaintiff was out of work because of his injury on August 11, 2003. The plaintiff's doctors did not want him returning to his past work in fleet service, and he continued to make reasonable efforts to look for other employment. The plaintiff filed a request under the Americans with Disabilities Act (ADA) with the defendant-employer, seeking work accommodations.
26. The defendant-employer honored the plaintiff's request for accommodations under the ADA by offering him the mail and freight report job again. The plaintiff started this job on August 20, 2003. The mail and freight job was not a "bid" job for the defendant-employer, meaning that other employees did not compete or apply to get this job. Rather, this was a job that involved special accommodations for employees who were injured or had medical restrictions. This job was temporary, and the plaintiff could not earn any overtime while working in it. The plaintiff did the mail and freight report job until September 9, 2003.
27. The Full Commission finds that the plaintiff's job doing mail and freight reports between August 20, 2003, and September 9, 2003, was not suitable employment.
28. On September 10, 2003, the defendant-employer transferred the plaintiff to the catering department. Other employees with the defendant-employer could "bid" for the catering department jobs. This job was not a permanent job in that the defendant-employer could only honor the plaintiff's request for special accommodation under the ADA for 60 work days under the fleet service union agreement. The plaintiff did not earn overtime while working in this job. The job ended on November 24, 2003, when the plaintiff's ADA accommodation expired.
29. Starting on November 23, 2003, the plaintiff began to receive unemployment compensation at the rate of $408.00 a week. In accordance with his obligations to seek other employment while receiving unemployment compensation, the plaintiff made numerous attempts to return to work with the defendant-employer and other employers after November 23, 2003. The plaintiff also took computer classes at a local community college to improve his marketable skills. These attempts to return to work were reasonable, but without success.
30. On May 3, 2004, Dr. Braunstein released the plaintiff from his medical care and told the plaintiff that he could return to work. Although the plaintiff was restricted from returning to his past work in fleet service and jobs that involved similar activities, the plaintiff was not restricted from performing less demanding and less physical work. The plaintiff still has significant motor and sensory loss after the ulnar surgery performed by Dr. Paramore on June 19, 2003.
31. On May 4, 2004, the plaintiff returned to work with the defendant-employer, who had offered him a job in the flight tower earning more than his pre-injury average weekly wages. This job is within the medical restrictions assigned by the plaintiff's doctors on May 3, 2004.
32. Because of his left ulnar neuropathy, the plaintiff has required considerable medical care, which has been reasonable and necessary.
33. The greater weight of the evidence indicates that the plaintiff has a fifty percent (50%) permanent partial disability rating to his left arm, a fifty percent (50%) permanent partial disability to the third finger in his left hand, and a fifty percent (50%) permanent partial disability rating to the fourth finger in his left hand. These ratings are based upon the plaintiff's post-surgical recovery, the lingering motor and sensory loss, and the extent of the anatomical damage from the plaintiff's left ulnar neuropathy and surgical reconstruction.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The plaintiff's left ulnar neuropathy is a compensable occupational disease under N.C. Gen. Stat. § 97-53(13). The onset date for this condition is June 12, 2003, when the plaintiff was first disabled and had been advised by competent medical authority of the relationship between his work and the ulnar neuropathy. The plaintiff's employment placed him at an increased risk of developing left ulnar neuropathy, and his work activities and employment significantly contributed to the development of this condition. See Rutledge v.Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983).
2. The plaintiff is entitled to temporary total disability benefits at the weekly rate of $624.59 for the following periods:
a. June 12, 2003, through July 5, 2003;
b. July 6, 2003, through July 22, 2003;
c. August 11, 2003, through August 19, 2003; and,
d. November 25, 2003, through May 3, 2004.
N.C. Gen. Stat. § 97-29.
3. The plaintiff is entitled to temporary partial disability benefits at a weekly compensation rate equal to sixty-six and two-thirds (66 2/3%) percent of the difference between his average weekly wages before the injury ($936.88) and the average weekly wages he earned during the following periods:
a. July 23, 2003, through August 10, 2003; and,
b. August 20, 2003, through November 24, 2003.
N.C. Gen. Stat. § 97-30.
4. The plaintiff has reached maximum medical improvement and, as of May 4, 2004, has returned to work earning more than his pre-injury average weekly wage. Thus, permanent partial disability compensation is the plaintiff's more favorable remedy for the period beginning May 4, 2004. See Whitley v. Columbia LumberMfg. Co., 318 N.C. 89, 348 S.E.2d 336 (1986).
5. The plaintiff is entitled to permanent partial disability benefits for the fifty percent (50%) permanent partial disability rating to his left arm. N.C. Gen. Stat. § 97-31(13).
6. The plaintiff is entitled to permanent partial disability benefits for the fifty percent (50%) permanent partial disability rating to his left third finger. N.C. Gen. Stat. § 97-31(4).
7. The plaintiff is entitled to permanent partial disability benefits for the fifty percent (50%) permanent partial disability rating to his left fourth finger. N.C. Gen. Stat. § 97-31(5).
8. The plaintiff is entitled to have the defendants provide all medical treatment given by Dr. Paramore, Dr. Braunstein, Dr. Nielsen, and the plaintiff's other medical providers with respect to his left ulnar neuropathy. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
9. The defendants are entitled to a credit for the amount of unemployment compensation paid to plaintiff during the periods in which temporary total disability compensation was awarded herein. N.C. Gen. Stat. § 97-42.1;Church v. Baxter Travenol Laboratories, Inc.,104 N.C. App. 411, 409 S.E.2d 715 (1991).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The defendants shall pay to the plaintiff temporary total disability benefits at the weekly rate of $624.59 for the following periods:
a. June 12, 2003, through July 5, 2003;
b. July 6, 2003, through July 22, 2003;
c. August 11, 2003, through August 19, 2003; and,
d. November 25, 2003, through May 3, 2004.
This compensation is subject to the attorney's fee and credit provided herein. Because this amount has accrued, it shall be paid to the plaintiff in a lump sum.
2. The defendants shall pay to the plaintiff temporary partial disability benefits at a weekly compensation rate equal to sixty-six and two-thirds (66 2/3%) percent of the difference between his average weekly wages before the injury ($936.88) and the average weekly wages he earned during the following periods:
a. July 23, 2003, through August 10, 2003; and,
b. August 20, 2003, through November 24, 2003.
This compensation is subject to the attorney's fee provided herein. Because this amount has accrued, it shall be paid to the plaintiff in a lump sum.
3. The defendants shall pay to the plaintiff permanent partial disability benefits for the (50%) permanent partial disability rating to his left arm at the weekly rate of $624.59 for 120 weeks, a total of $74,950.80, subject to the attorney's fee awarded herein. The portion of this amount that has accrued shall be paid in a lump sum.
4. The defendants shall pay to the plaintiff permanent partial disability benefits for the (50%) permanent partial disability rating to his left third finger at the weekly rate of $624.59 for 12.5 weeks, a total of $7,807.38, subject to the attorney's fee awarded herein. This amount has accrued and shall be paid in a lump sum.
5. The defendants shall pay to the plaintiff permanent partial disability benefits for the (50%) permanent partial disability rating to his left fourth finger at the weekly rate of $624.59 for 20 weeks, a total of $6,245.90, subject to the attorney's fee awarded herein. This amount has accrued and shall be paid in a lump sum.
6. The defendants shall be liable for all medical treatment given by Dr. Paramore, Dr. Braunstein, Dr. Nielsen, and the plaintiff's other medical providers with respect to his left ulnar neuropathy.
7. The defendants shall pay to the plaintiff's counsel a reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation due plaintiff, subject to the credit awarded herein. The portion of such fee that is based upon compensation that has accrued shall be paid to the plaintiff's counsel in lump sum; thereafter, the plaintiff's counsel shall receive every fourth weekly compensation check due to the plaintiff.
8. The defendants shall receive a credit for the amount of unemployment compensation paid to the plaintiff during the periods in which temporary total disability compensation was awarded herein.
This 22nd day of August 2005.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ PAMELA T. YOUNG COMMISSIONER